[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-10157
_____

D.C. Docket No. 1:15-cv-01422-AT


LUXOTTICA GROUP, S.p.A.,
an Italian corporation,
OAKLEY, INC.,
a Washington corporation,

                                   Plaintiffs - Appellees
                                   Cross Appellants,

versus

AIRPORT MINI MALL, LLC,
a Georgia limited liability company,
d.b.a. Old National Discount Mall,
YES ASSETS, LLC,
a Georgia limited liability company,
CHIENJUNG YEH,
a.k.a. Jerome C. Yeh,
DONALD C. YEH,
individually,
JENNY YEH,
ALICE JAMISON,

                                   Defendants - Appellants
                                   Cross Appellees.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

(August 7, 2019)

Before WILSON, JILL PRYOR and TALLMAN,[*] Circuit Judges.

JILL PRYOR, Circuit Judge:

Luxury eyewear manufacturers holding registered trademarks brought a contributory trademark infringement action under the Lanham Act against owners of a discount mall whose subtenants were selling counterfeit eyewear. At trial, the jury returned a verdict in the plaintiffs' favor. After careful review and with the benefit of oral argument, we conclude that none of the issues the defendants raise on appeal demonstrates reversible error, so we affirm the jury's verdict.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Luxottica Group, S.p.A. and its subsidiary Oakley, Inc. (collectively and individually "Luxottica") manufacture and sell luxury eyewear and own registered trademarks for the Ray-Ban and Oakley brands. Defendants Jerome and Jenny Yeh own defendant Yes Assets, LLC. In 2004, Yes Assets purchased the Old National Village Shopping Center in College Park, Georgia.

_____

[*] Honorable Richard C. Tallman, United States Circuit Judge for the Ninth Circuit, sitting by designation.

2

The Shopping Center included about 30 store fronts as well as an approximately 79,000-square-foot indoor space (the "Mall"), which contained between 120 and 130 booths to lease to individual vendors. Defendant Alice Jamison, the Yehs' daughter, managed the Shopping Center. Her responsibilities included reviewing leases, collecting rent, and visiting the Shopping Center and Yes Assets' tenants, including the lessee of the Mall.

Until December 1, 2009, Yes Assets leased the Mall to a tenant, who assigned it to a subtenant, who subleased it to former Georgia congressman Pat Swindall, who in turn subleased the booths to vendors. From December 1, 2009 forward, Yes Assets leased the Mall to defendant Airport Mini Mall, LLC ("AMM"), a company Jerome and Jenny created and later gave to their son, defendant Donald Yeh, and the Mall became known as the International Discount Mall, AMM's tradename. Under the lease agreement, Yes Assets provided AMM and its subtenants (the vendors in the 120 to 130 booths) with a variety of services—including lighting, water, sewerage, maintenance and repairs, painting, and cleaning—and a parking area for customers. Greg Dickerson, whom Jerome hired as AMM's property manager, subleased the booths to vendors and reported to Jamison and Jerome until 2013, when Jerome had a stroke, and to Jamison and Donald afterward.

3

AMM's tenure as the Mall's landlord saw three law enforcement raids there, during which officers executed search warrants, arrested subtenants, and seized alleged counterfeits of Luxottica eyewear and other brands' products. After the first raid, law enforcement left a copy of the search warrant and a list of items seized, including eyewear bearing Luxottica's marks, at the raided booth. The second raid lasted more than 14 hours and involved approximately 30 federal and local law enforcement agents who shut down the Mall to execute search warrants, arrested subtenants for selling counterfeit goods, seized thousands of counterfeit items bearing Luxottica's marks, and loaded the items onto a tractor-trailer parked in front of the Shopping Center. Dickerson witnessed the second raid from the Shopping Center's parking lot and notified Jamison, Donald, and Jerome and Jenny's attorney, Louis Bridges. Dickerson later walked through the Mall to compile a list of the booths where law enforcement had seized goods and informed Jamison, Jerome, and Bridges about his inquiries of subtenants regarding the raid and whether they were selling counterfeit items. Each subtenant denied selling counterfeit merchandise, but Jamison admitted that she would expect the subtenants to lie if they were selling counterfeit goods. On Bridges' advice, the defendants decided to take no action against the subtenants unless the subtenants were convicted of a crime. More than a year after Luxottica filed this lawsuit,

4

police executed several more search warrants at the Mall and seized additional counterfeit items bearing Luxottica's marks.

Luxottica twice sent letters notifying the defendants that their subtenants were not authorized to sell Luxottica's eyewear and that any mark resembling Ray-Ban or Oakley marks would indicate that the glasses were counterfeit. The second letter also identified specific booths Luxottica suspected of selling counterfeit eyewear. Jamison and Donald were aware of both letters. Dickerson visited the booths named in the second letter but made no attempt to determine whether those vendors' eyewear products were counterfeit or to terminate their leases. After Luxottica filed this lawsuit, Jamison and Bridges attended a meeting at the College Park Police Department to discuss the unlawful selling of counterfeit products at the Mall.

Despite the raids, letters, and meeting with law enforcement, the defendants took no steps to evict the infringing subtenants; they even renewed leases with several of the subtenants who had been arrested during the 14-plus-hour raid. In the month leading up to the filing of this lawsuit, Isabel Rozo, an employee of Luxottica's private investigator Geanie Johansen, purchased and photographed $15 and $20 counterfeit Ray-Ban glasses at several booths. Ray-Ban glasses normally retail for $140 to $220 a pair.

5

Luxottica sued the defendants for contributory trademark infringement under § 32 of the Lanham Act, 15 U.S.C. § 1114. The district court denied the defendants' motions in limine to exclude evidence, except for their second motion, which it granted in part to limit the evidence Luxottica could introduce regarding sales at the Mall of counterfeit non-Luxottica brands and counterfeit sales that occurred before AMM took over as the Mall's landlord. After an 11-day trial, the jury returned a special verdict holding all defendants except Jenny liable for contributory trademark infringement and assessing $100,000 in damages for each infringed trademark, totaling $1.9 million in damages. Having moved for judgment as a matter of law after the close of all the evidence, the defendants renewed their motion, which the district court denied.

The defendants appeal the jury verdict, a portion of the district court's instructions to the jury regarding the application of Georgia landlord-tenant law, and the district court's denials of their motions in limine and renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b).[1]

---

[1] The defendants appeal the denial of their first motion for judgment as a matter of law made under Rule 50(a), but because the only way to preserve a Rule 50(a) motion is to renew it under Rule 50(b), we review only the denial of their renewed motion under Rule 50(b). The defendants also appeal the district court's submission to the jury of the amount of statutory damages to be awarded. Because they make no argument about the statutory damages issue in their briefs on appeal, however, we deem it abandoned. *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). We grant the defendants' motion to dismiss the cross-appeal because Luxottica has abandoned it.

## II.    STANDARDS OF REVIEW

We review *de novo* questions of law, such as the legal standard for liability for contributory trademark infringement.  *U.S. Sec. & Exch. Comm'n v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 795 (11th Cir. 2015).  We also review *de novo* a district court's denial of a Rule 50(b) motion.  *Id.* at 813.  "Judgment as a matter of law is appropriate only if the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict."  *Equal Emp't Opportunity Comm'n v. Exel, Inc.*, 884 F.3d 1326, 1329 (11th Cir. 2018) (internal quotation marks omitted), *cert. denied*, 139 S. Ct. 1373 (2019).  "We consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party."  *Id.* (internal quotation marks omitted).  "We will not second-guess the jury or substitute our judgment for its judgment if its verdict is supported by sufficient evidence."  *Id.* (internal quotation marks omitted).

Orders denying motions in limine are reviewed for abuse of discretion.  *Kropilak v. 21st Century Ins. Co.*, 806 F.3d 1062, 1067 (11th Cir. 2015).  Under that standard, we will reverse a district court's ruling "only if the court applie[d] an incorrect legal standard, follow[ed] improper procedures in making the determination, or ma[d]e[] findings of fact that are clearly erroneous."  *Id.* (internal

7

quotation marks omitted).  The movant must also establish "substantial prejudicial effect."  *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1276 (11th Cir. 2008).

This Court reviews jury instructions *de novo* to determine whether they "misstate the law or mislead the jury to the prejudice of the objecting party." *Bhogaita v. Altamonte Heights Condo. Ass'n*, 765 F.3d 1277, 1285 (11th Cir. 2014) (internal quotation marks omitted).  Although our review is *de novo*, we will reverse based on a district court's jury instructions "only where we are left with a substantial and ineradicable doubt as to whether the district court properly guided the jury."  *Id.* (internal quotation marks omitted).

## III.    DISCUSSION

We affirm the district court on each issue appealed.  The district court (1) correctly determined that the evidence was sufficient—even under the legal standard the defendants urge us to adopt—to support the jury's verdict finding the defendants liable for contributory trademark infringement; (2) committed no reversible error in instructing the jury; (3) correctly determined that the evidence was sufficient to support the jury's verdict on each defendant's individual liability; and (4) did not abuse its discretion in the challenged evidentiary rulings.

## A. Luxottica Presented Sufficient Evidence to Sustain the Jury's Verdict on Contributory Trademark Infringement.

Under the Lanham Act, the owner of a registered trademark may hold someone contributorially liable for trademark infringement if that person induces

8

or knowingly facilitates the infringement. The defendants argue that the district court should have followed the reasoning of a Second Circuit case that they believe imposed a tougher knowledge requirement for contributory trademark infringement claims. Under that court's reasoning, the defendants argue, the evidence was insufficient to prove that they had the requisite knowledge of, or demonstrated willful blindness to, their subtenants' direct infringement. We disagree and affirm the district court's denial of the defendants' Rule 50(b) motion. First, we explain the elements of the contributory trademark infringement cause of action. Second, because the defendants do not contest that landlords may be held contributorially liable for their (sub)tenants' direct trademark infringement, we assume without deciding that contributory liability for trademark infringement extends to the landlord-tenant context. Third, we resolve the defendants' argument about the proper legal standard by assuming without deciding that liability for contributory trademark infringement requires that the defendant have knowledge of specific acts of direct infringement. Even under this standard, the evidence was sufficient to support the jury's verdict because the defendants had at least constructive knowledge of their subtenants' direct infringement.

## 1. Contributory Liability Under the Lanham Act

The contributory trademark infringement cause of action stems from the application of "basic tort liability concepts to determine the scope of liability"

9

under the Lanham Act.  *Duty Free Americas, Inc. v. Estée Lauder Cos.*, 797 F.3d 1248, 1276 (11th Cir. 2015) (internal quotation marks omitted).[2]  The Supreme Court first acknowledged the existence of this cause of action in *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844 (1982).  In that case, manufacturers had supplied pharmacists with a generic version of a drug whose brand name was trademarked.  *Id.* at 846-48.  Some pharmacists had infringed the brand name manufacturer's mark by mislabeling bottles containing generic capsules as containing brand name capsules.  *Id.* at 848-51, 854.  But instead of suing the infringing pharmacists, the brand name manufacturer sued the generic manufacturers, *id.* at 846-47, 849-51, prompting the Supreme Court to recognize in the Lanham Act a cause of action for contributory infringement:  "if a manufacturer or distributor intentionally induces another to infringe a trademark, or if it continues to supply its product to one whom it knows or has reason to know is engaging in trademark infringement, the manufacturer or distributor is contributorially responsible for any harm done as a result of the deceit."  *Id.* at 854.[3]

---

[2] The plain text of § 32 of the Lanham Act prohibits only direct infringement:  a person may not "use" or "reproduce, counterfeit, copy, or colorably imitate a registered mark . . . in connection with the sale . . . of goods or services" if such use "is likely to cause confusion." 15 U.S.C. § 1114(1).

[3] The Supreme Court ultimately ruled in the generic manufacturers' favor, holding that the Court of Appeals should not have disturbed the district court's findings that the generic

A claim for contributory trademark infringement thus has two elements: (1) a person or entity commits direct trademark infringement under the Lanham Act; and (2) the defendant (a) "intentionally induces" the direct infringer to commit infringement, (b) supplies a "product" to the direct infringer whom it "knows" is directly infringing (actual knowledge), or (c) supplies a "product" to the direct infringer whom it "has reason to know" is directly infringing (constructive knowledge). *See id.* The defendants do not challenge the first element—the jury's finding of direct infringement by their subtenants. As to the second element, Luxottica proceeded on a knowledge rather than an intentional inducement theory, so only the actual and constructive knowledge prongs of the second element are at issue in this appeal.

In support of its theory that the defendants had at least constructive knowledge of their subtenants' infringement, Luxottica presented evidence tending to show that the defendants exhibited willful blindness to the subtenants' unlawful conduct. Across the circuits, a consensus has developed that willful blindness is one way to show that a defendant had constructive knowledge in cases of contributory trademark infringement. *See Coach, Inc. v. Goodfellow*, 717 F.3d 498, 503, 505 (6th Cir. 2013); *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 109-10

---

manufacturers had not "suggested, even by implication, that pharmacists should dispense generic drugs incorrectly identified as" the brand name drug. *Inwood*, 456 U.S. at 852, 856-58.

11

(2d Cir. 2010); *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 265 (9th Cir. 1996); *Hard Rock Cafe Licensing Corp. v. Concession Servs., Inc.*, 955 F.2d 1143, 1149, 1151 n.5 (7th Cir. 1992); *see also United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 902 (11th Cir. 2003) (holding, in the context of the Medicare Secondary Payer statute, that "[a] party that willfully blinds itself to a fact . . . can be charged with constructive knowledge of that fact"). Willful blindness occurs when a person "suspect[s] wrongdoing and deliberately fail[s] to investigate." *Hard Rock Cafe*, 955 F.2d at 1149. We agree with the other circuits that willful blindness is a form of constructive knowledge for contributory trademark infringement. We evaluate the strength of Luxottica's evidence regarding willful blindness and constructive knowledge in Part III.A.3.

## 2.  Landlord Liability for Contributory Trademark Infringement

Whether contributory liability for trademark infringement extends to the landlord-tenant context is a question of first impression for this Court. The defendants in *Inwood* supplied the very product the direct infringers mislabeled with the plaintiff's trademark. 456 U.S. at 846-50. In contrast, the defendants in this case supplied services and support—such as space, utilities, maintenance, and parking—that facilitated the direct infringers' sale of counterfeit goods. In this case, the defendants do not contest that *Inwood*'s contributory trademark infringement cause of action may be applied to the landlord-tenant context. We

12

therefore assume without deciding that a landlord may be contributorially liable for its (sub)tenants' direct trademark infringement if the landlord intentionally induces the infringement *or* knows or has reason to know of the infringement while supplying a service (such as space, utilities, or maintenance) that facilitates it.[4]

### 3. The Evidence Was Sufficient to Prove That the Defendants Had at Least Constructive Knowledge of Specific Acts of Infringement.

Pursuing a knowledge theory of contributory trademark infringement, Luxottica sought to prove that the defendants knew or had reason to know that their subtenants were selling counterfeit items yet continued to supply services (space, utilities, maintenance, and parking) that enabled the subtenants to sell their goods. The question that arises—another one of first impression for this Court—is whether the knowledge theory of contributory liability requires the plaintiff to prove that the defendant had actual or constructive knowledge of *specific* infringing acts. We need not answer this question, however, because even if

---

[4] We note that three circuits have applied *Inwood* to owners of flea markets whose tenants sold counterfeit goods. *See Hard Rock Cafe*, 955 F.2d at 1148-49; *Fonovisa*, 76 F.3d at 265 (citing *Hard Rock Cafe*); *Coach*, 717 F.3d at 503-04 (citing *Hard Rock Cafe* and *Fonovisa*). Such a result is also consistent with the general tort liability principles upon which *Inwood*'s analysis rested. *See Duty Free Americas*, 797 F.3d at 1276 ("[T]he Lanham Act is derived generally and purposefully from the common law tort of unfair competition . . . . In construing the Act, then, courts routinely have recognized the propriety of examining basic tort liability concepts to determine the scope of liability." (internal quotation marks omitted)); *see also* Restatement (Second) of Torts § 877(c) (Am. Law Inst. 1979) (June 2019 Westlaw update) ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . permits the other to act upon his premises or with his instrumentalities, knowing or having reason to know that the other is acting or will act tortiously."); *id.* cmt.d.

13

liability for contributory trademark infringement requires the defendant to have knowledge of specific acts of direct infringement, the evidence in this case was sufficient for a reasonable jury to find that the defendants had at least constructive knowledge of (or were willfully blind to) specific acts of direct infringement by their subtenants.

The defendants argue that the district court should have applied what they deem a stricter standard from *Tiffany (NJ) v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010), in ruling on their renewed motion for judgment as a matter of law. In *Tiffany*, the jewelry titan sued the online listing service eBay for contributory trademark infringement because vendors listed counterfeit Tiffany products for sale on eBay's website. *Id.* at 96-97. Whenever Tiffany notified eBay of a direct infringer's identity, eBay delisted the vendor within 24 hours. *Id.* at 99. But, by itself, eBay was unable to identify and block each direct infringer, even with 200 employees focused on that task, because its website contained 100 million listings, and eBay lacked the ability to inspect goods in person and the expertise to distinguish Tiffany products from non-Tiffany products. *Id.* at 97-98. "For contributory trademark infringement liability to lie," the Second Circuit held, "a service provider must have more than a general knowledge or reason to know that its service is being used to sell counterfeit goods. Some contemporary knowledge of which particular listings are infringing or will infringe in the future is

14

necessary." *Id.* at 107. Because Tiffany's demand letters identified no additional sellers of counterfeit goods other than the sellers eBay had already delisted, eBay lacked actual or constructive knowledge of the remaining direct infringers. The court thus upheld the bench trial verdict in favor of eBay. *Id.* at 96, 109.

The defendants articulate *Tiffany*'s legal standard for contributory trademark infringement as whether "Plaintiffs provide[d] notice to Defendants that a particular seller was then selling counterfeit versions of Plaintiffs' product." Appellants' Initial Br. at 22 (internal quotation marks omitted). The defendants err, though, in asserting that *Tiffany* narrowed the sources of a defendant's actual or constructive knowledge to just one: notice by the trademark holders. *Tiffany* did not categorically shift the burden onto trademark holders to provide notice to defendants; it simply clarified that certain facts of the case—a marketplace of 100 million listings and eBay's inability to inspect goods in person and lack of expertise to distinguish Tiffany from non-Tiffany jewelry—made it unlikely that eBay could identify the infringing vendors on its own, without help from Tiffany. *Tiffany*, 600 F.3d at 97-98, 109. In arguing that it was Luxottica's burden to notify the defendants of the infringing subtenants' identities, the defendants fail to acknowledge that actual or constructive knowledge of the direct infringers' identities could arise from many sources, including steps the defendants could have taken to investigate alleged direct infringement at the Mall after being put on

notice by Luxottica that unnamed subtenants' may have been selling counterfeit Luxottica products.

In any event, we need not decide today whether a defendant must be found to have had knowledge of specific acts of direct infringement for contributory liability to attach.  Even if specific knowledge is necessary, the trial evidence was sufficient to prove that the defendants had at least constructive knowledge of specific instances where their subtenants infringed Luxottica's marks.  Unlike in *Tiffany*, the defendants here did not need Luxottica's help to identify the infringing subtenants.  Although *Inwood* created "no affirmative duty to take precautions against the sale of counterfeits," *Hard Rock Cafe*, 955 F.2d at 1149, the jury reasonably could have found that Luxottica's notice letters would have prompted a reasonable landlord to do at least a cursory visual inspection of the Mall's 130 booths to determine which vendors displayed eyewear with Luxottica's marks and sold it at prices low enough—$15 or $20 a pair for glasses that typically retail at $140 to $220 a pair—to alert a reasonable person that it was counterfeit.[5] Similarly, the jury reasonably could have found that a cursory visual inspection of 130 booths to see if they displayed what appeared to be counterfeit Luxottica

---

[5] One of Luxottica's witnesses acknowledged that there is a legitimate secondary market for Ray-Ban and Oakley eyewear, so the statements in Luxottica's letters that the Mall's tenants were unauthorized retailers were of limited use to the defendants.  Nevertheless, the jury reasonably could have found that the defendants knew or should have known that $15 and $20 eyewear bearing Ray-Ban trademarks was counterfeit.

16

eyewear was not so burdensome as to relieve the defendants of the responsibility to investigate after being informed by Luxottica that unnamed subtenants may have been engaging in illegal activity.

What's more, previously we have held that evidence of "serious and widespread" infringement makes it more likely that a defendant knew about the infringement. *Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1522 (11th Cir. 1992). The three law enforcement raids—one of which lasted over 14 hours and required a tractor-trailer to haul away the seized merchandise—evidenced "serious and widespread" violations that gave the defendants at least constructive knowledge that their subtenants were selling counterfeit goods. *Id.* After the 14-plus-hour raid, Dickerson, the defendants' property manager, walked through the Mall; compiled a list of booths where law enforcement had seized goods; and informed Jerome, Jamison, and Bridges about his conversations with subtenants regarding the raid and whether they were selling counterfeit products. The record evidence of (1) the raids, arrests, and seizures, (2) the meeting at the College Park Police Department Jamison and Bridges attended where they discussed the sale of counterfeit goods at the Mall, and (3) the defendants' ability to visually inspect the approximately 130 booths was, taken together, sufficient to support a jury finding that the defendants had at least constructive knowledge of,

17

or were willfully blind to learning, which subtenants were directly infringing

Luxottica's trademarks.

In sum, evidence of the defendants' knowledge of specific infringing acts by

subtenants who relied on the services the defendants provided (including space,

utilities, and maintenance) amply supported the jury verdict.  The district court did

not err in denying the defendants' Rule 50(b) motion.

## B.  The District Court Made No Reversible Error in Instructing the Jury.

The defendants take issue with two of the district court's instructions to the

jury.  We discern no reversible error in either one.

First, the defendants protest the district court's instruction to the jury that

Georgia law permits landlords to evict commercial tenants without resort to legal

proceedings where the tenant has contractually waived its right to those procedural

protections.  *See Rucker v. Wynn*, 441 S.E.2d 417, 419 (Ga. Ct. App. 1994),

*disapproved on other grounds by George v. Hercules Real Estate Servs., Inc.*,

795 S.E.2d 81, 89 (Ga. Ct. App. 2016).  The defendants contend that *Rucker* is

inapposite because in that case, the tenant's nonpayment of rent constituted a clear

default under the lease.  *Rucker*, 441 S.E.2d at 419.  But here, the defendants

assert, they lacked clear evidence of their subtenants' defaults.  They argue that

without clear evidence of their subtenants' defaults, they could have been sued for

18

wrongful eviction had they attempted "to use self-help to evict [their] [sub]tenants." Appellants' Initial Br. at 46.

Yet the defendants' contention that they lacked clear evidence of their subtenants' defaults belies the evidence presented at trial and ignores the provisions in AMM's subleases that would have permitted the defendants to evict infringing subtenants. AMM's standard sublease agreement provided that a "[v]erified written complaint[]" that a subtenant was selling counterfeit goods would constitute an "immediate breach" of the lease and authorize AMM to dispossess the subtenant "immediately." Doc. 162-12 at 21.[6] Bridges, Jerome and Jenny's counsel, acknowledged at trial that a search warrant accompanied by a sworn affidavit would qualify as a "[v]erified written complaint[]."[7] *Id.* The jury reasonably could have found that the defendants could have sought copies of search warrants executed during the raids—one of which was left at the booth targeted by the first raid—to obtain proof of their subtenants' defaults.

Even if law enforcement had refused to provide copies of the search warrants, the defendants had another tool at their disposal. AMM's standard sublease agreement also provided that a subtenant's failure to comply with trademark law would constitute a default on the sublease. Thus, the jury

---

[6] "Doc. #" refers to the numbered entry on the district court's docket.

[7] Bridges did not represent the defendants at trial.

19

reasonably could have found that the defendants could have photographed the booths displaying counterfeit Luxottica-brand eyewear for sale—just as Rozo, the employee of Luxottica's private investigator Johansen, did—which would have assisted the defendants in establishing that their subtenants were in breach of their subleases. Upon a subtenant's first default under the sublease agreement, AMM could evict the subtenant and retake possession of the booth after providing five days' notice; no notice was necessary for a subsequent default.

Likewise, Yes Assets' lease with AMM required AMM to "comply with all applicable laws," and failure to do so would constitute a default on the lease, entitling Yes Assets to terminate the lease and immediately assume possession of the Mall. Doc. 162-9 at 7, 31. AMM's continued provision of services to the infringing subtenants despite having at least constructive knowledge of their infringement violated the Lanham Act. *See* Part III.A.3. In turn, AMM's continuing support of infringing subtenants put it in default of its lease with Yes Assets and gave Yes Assets grounds to terminate the lease and dispossess AMM.

As part of their contention that they lacked clear evidence of their subtenants' breaches of the subleases, the defendants further argue that Luxottica's notice letters were nothing more than unsubstantiated hearsay insufficient to provide clear evidence of breaches. We reject this argument as well. For one thing, the defendants never objected at trial to the letters' admission. For another,

20

the letters were admissible for their effect on the recipient, not for the truth of the matter asserted, so they were not hearsay. Fed. R. Evid. 801(c). And even without these letters, the jury reasonably could have found that the search warrants or photographs of counterfeit eyewear on display would have provided the defendants with clear evidence of their subtenants' breaches of their subleases.

Second, the defendants protest the district court's instruction that the jury could find that the defendants had the ability to control their subtenants' activities in the Mall if "Airport Mini Mall, LLC, Yes Assets, LLC, Jerome Yeh, Jenny Yeh, Donald Yeh, *and/or* Alice Jamison possessed the right, ability[,] or authority to control either (i) the use of the physical retail space that it rented at the Discount Mall, or (ii) the activities that any of its vendors could engage in while occupying such space at the Discount Mall." Doc. 155 at 17 (emphasis added). Essentially, the defendants object on appeal to the district court's use of "and/or." The defendants easily could have requested that the district court fix this conjunction, but they forfeited this objection by failing to raise it to the district court. Even if they had preserved it, however, the district court's instruction was not reversible error. Although AMM was the Mall's sole landlord, a corporation may act only through its agents. *See United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1271 (11th Cir. 2009). The district court's instructions could have been more precise by explaining, based on our above descriptions of AMM's standard sublease

21

agreement and Yes Assets' lease with AMM, that (1) Jerome, Jenny, and Donald were agents of AMM with the power to evict infringing subtenants; and (2) Yes Assets and its manager Jamison could have evicted AMM for failing to evict the infringing subtenants. But without any "substantial and ineradicable" sense that the district court's imprecise instruction misled the jury or prejudiced the defendants, we will not reverse. *Bhogaita*, 765 F.3d at 1285.

We find no reversible error in either of the challenged jury instructions.

## C. The Evidence Was Sufficient to Support the Jury's Verdict on the Individual Defendants' Liability for Contributory Infringement.

The defendants contest the sufficiency of the evidence supporting the jury's verdict holding Jerome, Donald, and Jamison individually liable for contributory trademark infringement. Construing the evidence in the light most favorable to Luxottica, as we must in reviewing the denial of the defendants' Rule 50(b) motion, *Exel*, 884 F.3d at 1329, we conclude that the evidence was sufficient to show that these three defendants had at least constructive knowledge of direct infringement by subtenants who relied on the services they provided.

Jerome was copied on e-mails between Swindall, who leased the Mall from Yes Assets up until December 2009, and the College Park Police Department regarding alleged sales of counterfeit goods at the Mall in 2008. The jury could infer from Swindall's testimony that these e-mails would have put a reasonable landlord on notice to watch out for sales of counterfeit goods, including goods

22

bearing Luxottica's marks.  Jerome was also informed about Dickerson's conversations with subtenants after the 14-plus-hour raid that took place during AMM's tenure as the Mall's landlord.  Donald admitted he knew about Luxottica's notice letters and widespread sales of counterfeit merchandise.  And Jamison, who managed the Shopping Center, knew about Luxottica's notice letters and at least one of the raids and attended a meeting at the College Park Police Department after this lawsuit was filed to discuss the sale of counterfeit products at the Mall.[8]

## D. The District Court Did Not Abuse Its Discretion in Its Evidentiary Rulings.

The defendants appeal five sets of the district court's evidentiary rulings. We conclude that the district court did not abuse its discretion in any of these rulings.  First, the defendants argue that the district court abused its discretion in admitting the testimony of and counterfeit eyewear obtained by Rozo, an employee of Johansen, who was the investigator Luxottica hired to make undercover

---

[8] The defendants argue that Luxottica failed to pierce the corporate veil under Georgia law and show that the individual defendants were the "moving, active, conscious force[s]" behind their subtenants' infringement.  Appellants' Initial Br. at 55 (internal quotation marks omitted).  But Luxottica needed to prove only the elements of contributory trademark infringement:  (1) direct infringement by a third party and (2) *either* intentionally inducing the direct infringement *or* providing a product or service to the direct infringer despite having actual or constructive knowledge of the direct infringement.  The evidence was sufficient to support the jury's finding that Luxottica established both elements as to Jerome, Donald, and Jamison. Piercing the corporate veil is irrelevant to proving individual contributory liability, as is demonstrating that the defendants were the "moving, active, conscious force[s]" behind their subtenants' infringement, which is the standard for imposing individual liability for *direct*, not *contributory*, infringement.  *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477-78 (11th Cir. 1991) (internal quotation marks omitted).

23

purchases and take photographs of counterfeit eyewear at the Mall.  They assert

that Rozo's testimony was unduly prejudicial because the destruction of her

contemporaneous notes hindered both her ability to give reliable testimony and

their ability to cross-examine her.[9]  We reject the defendants' contention because

the e-mails Rozo sent to Johansen within 24 hours of her visits to the Mall

provided a near-contemporaneous account, and we have found no case holding that

destruction of a witness's contemporaneous notes—especially when not done in

bad faith—requires the harsh sanction of complete exclusion of the witness's

testimony.  Excluding evidence as unduly prejudicial under Federal Rule of

Evidence 403 "is an extraordinary remedy [that] should be used sparingly," and, in

applying the rule, "courts must look at the evidence in a light most favorable to

admission."  *Aycock v. R.J. Reynolds Tobacco Co.*, 769 F.3d 1063, 1069 (11th Cir.

2014) (internal quotation marks omitted).  We are hard-pressed to say that any

"unfair prejudice" caused by Rozo's testimony and the admission into evidence of

the eyewear she obtained and the photographs she took at the Mall "substantially

---

[9] Luxottica argues that the defendants failed to preserve their objection to the admission of Rozo's testimony and the eyewear she purchased at the Mall.  Because we conclude that the district court did not abuse its discretion in admitting this evidence, we need not decide whether the defendants preserved this objection or, if not, whether the district court committed plain error.

The defendants have abandoned the argument they made to the district court about spoliation of evidence because they make no such argument in their briefs on appeal.  *See Sapuppo*, 739 F.3d at 681.

24

outweighed" their "probative value." Fed. R. Evid. 403. Moreover, the defendants were able to use cross-examination to undermine Rozo's testimony and that of another Luxottica witness by demonstrating that these witnesses could not determine whether the counterfeit eyewear and photos of counterfeit eyewear displayed for sale that were presented to the jury came from the defendants' mall or a different mall.

Second, the defendants protest the district court's rearrangement of Exhibit 646, a collection of counterfeit glasses Rozo purchased at the Mall and the bags associated with each pair of glasses.[10] As we understand it, shortly after Rozo purchased each pair of glasses, she placed them in plastic bags and affixed stickers showing the number of the booth that sold her the glasses.[11] During the trial, three witnesses handled the exhibit, and somehow the glasses got placed into the wrong bags.[12] When counsel for both sides were unable to agree on how to restore the

---

[10] Luxottica argues that the defendants also failed to preserve their objection on this issue. Again, because we determine that the district court did not abuse its discretion in rearranging the exhibit, we need not decide whether the defendants preserved this objection or, if not, whether the district court committed plain error.

[11] The record leaves unclear whether Rozo or Mall vendors supplied the bags. In addition, the trial transcript suggests that Rozo was inconsistent about putting the stickers on the glasses versus the bags, and she also testified that the stickers sometimes fell off, both of which may have contributed to the glasses becoming disassociated from their bags.

[12] Rozo handled the exhibit first, then Johansen, then Luxottica's director of intellectual property for the Americas. Twice—during Johansen's testimony and after the director's testimony—it emerged that the glasses were no longer in the proper bags, but it is unclear how this happened. To resolve this issue, we need not determine how the glasses became separated from their proper bags.

25

exhibit, the district court rearranged the exhibit's contents outside of the presence

of the jury and counsel to ensure that each pair of glasses was placed in the correct

bag before making the exhibit available to the jury for its deliberations.  Citing no

authority, the defendants argue that determining the proper relationship between

the glasses and the bags was a job for the jury, not the judge.  We conclude that the

district court did not abuse its discretion in rearranging the exhibit because trial

judges retain discretion "to enable the jury to hear [and examine] the evidence in a

clear, orderly and methodical manner."  *United States v. Watson*, 466 F.2d 549,

550 (5th Cir. 1972).[13]  And even if the district court abused its discretion in

reorganizing the exhibit outside of the presence of the jury and counsel, the

defendants do not argue that the district court reorganized the exhibit erroneously

or in a way that prejudiced them, so any error was harmless.  *See* 28 U.S.C.

§ 2111; Fed. R. Civ. P. 61.

Third, the defendants object to the admission of evidence of supposed

counterfeit sales that took place before AMM's assumption of the Mall's lease,

arguing that this evidence was irrelevant and unduly prejudicial.  But evidence of

"serious and widespread" sales of counterfeit goods increases the likelihood that

the defendants knew about and failed to stop the infringement of Luxottica's

---

[13] Decisions of the former Fifth Circuit rendered before the close of business on September 30, 1981 are binding on this Court. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

marks. *See Mini Maid*, 967 F.2d at 1522. Apart from Swindall's testimony, which we address below, the only other evidence of pre-December 2009 counterfeit sales that the defendants challenge is Luxottica's questioning of Jamison and Dickerson regarding what they knew about alleged infringement at the Mall before AMM's assumption of the lease. To lay an evidentiary foundation for the defendants' knowledge of pre-December 2009 counterfeit sales, the district court permitted Luxottica to cross-examine the individual defendants on this topic. When Jamison and Dickerson denied knowledge of the pre-December 2009 allegations, Luxottica ended these lines of questioning. Given the limited questions posed to Jamison and Dickerson, we disagree that any prejudice introduced by these questions "substantially outweighed" their significant "probative value." Fed. R. Evid. 403.

Fourth, the defendants object to the admission of evidence of alleged infringement of non-Luxottica brands, arguing that this evidence was also irrelevant and unduly prejudicial because Luxottica failed to show that the non-Luxottica goods were actually counterfeit. Yet the jury reasonably could have inferred that even mere allegations of counterfeit sales of non-Luxottica products should have alerted the defendants to watch out for infringement of Luxottica's brands, so this evidence was relevant to the jury's determination of liability. Further, in ruling on the defendants' second motion in limine, the district court required Luxottica to ensure that the evidence of infringement of non-Luxottica

27

products did not outweigh the evidence it presented of infringement of its own products. The defendants make no argument that the evidence of infringement of non-Luxottica brands predominated over evidence of infringement of Luxottica brands. In addition, the district court gave the jury a limiting instruction that it could not find the defendants liable based solely on evidence of alleged infringement of other brands, a straightforward instruction "that the jury could easily understand and take to heart." *United States v. Mateos*, 623 F.3d 1350, 1365 (11th Cir. 2010). "We presume that a jury follows the instructions given to it by the district court," and the defendants "ha[ve] offered nothing to rebut this presumption." *Wilbur v. Corr. Servs. Corp.*, 393 F.3d 1192, 1201 (11th Cir. 2004) (internal quotation marks omitted). Because the defendants have not demonstrated their entitlement to the "extraordinary remedy" of exclusion of all evidence of infringement of other brands under Federal Rule of Evidence 403, the district court did not abuse its discretion in admitting this evidence. *Aycock*, 769 F.3d at 1069 (internal quotation marks omitted).

Fifth, the defendants object to the testimony from Swindall, the Mall's landlord prior to December 2009, because Luxottica failed to name Swindall in the pretrial witness list as a rebuttal witness and, according to the defendants, his testimony was irrelevant and unduly prejudicial. Neither reason persuades us. "Rebuttal witnesses are a recognized exception to all witness disclosure

28

requirements," *United States v. Windham*, 489 F.2d 1389, 1392 (5th Cir. 1974),

and "[t]he trial judge has broad discretion in determining whether to admit

evidence and witnesses not included in pretrial orders," *Calamia v. Spivey*,

632 F.2d 1235, 1237 (5th Cir. Unit A 1980); *see also Travelers Ins. Co. v. Dykes*,

395 F.2d 747, 749 (5th Cir. 1968) ("Much considered and wise discretion must be

accorded to a district judge as [s]he deals with the infinite variables of evidence.").

Swindall testified regarding e-mails between law enforcement and himself, on

which Jerome was copied, about a raid that took place before the defendants took

over as the Mall's landlord.  As the district court recognized, Swindall's testimony

and the e-mails were probative of Jerome's (and possibly other defendants') actual

or constructive knowledge of the infringement of Luxottica's marks after AMM

became the Mall's landlord—an important element of Luxottica's claim that

Jerome and other defendants were contributorially liable.  And the district court

limited Swindall's testimony to the e-mails and any conversations he had with

Jerome about the e-mails.  Given the district court's wide discretion regarding

evidentiary matters, the probative value of Swindall's testimony to Luxottica's

case, and the limited nature of his testimony, we conclude that the district court

committed no abuse of discretion in permitting him to testify.[14]

---

[14] Although the defendants repeatedly emphasize that Swindall had previous perjury convictions, they cite no authority suggesting that the district court had to exclude his testimony based on that fact.  *See United States v. Swindall*, 971 F.2d 1531, 1534 (11th Cir. 1992).  The

We affirm the district court's rulings on each evidentiary issue that the defendants appeal.

## IV.    CONCLUSION

The evidence was sufficient to support the jury's verdict holding the defendants liable for contributory trademark infringement under the Lanham Act. Concluding that the district court made no reversible error regarding any of the issues the defendants submit for our review, we affirm.

**AFFIRMED.**

---

district court properly permitted the defendants significant cross-examination regarding Swindall's perjury convictions, as allowed by Federal Rule of Evidence 609(b) where the witness was convicted and released from confinement more than 10 years earlier. The defendants' cross-examination fully informed the jury as to reasons why they might doubt his credibility, and the jury was entitled to assess his credibility as it saw fit. *See J & H Auto Trim Co. v. Bellefonte Ins. Co.*, 677 F.2d 1365, 1366, 1375-76 (11th Cir. 1982) (reinstating jury verdict, despite trial judge's disbelief of witnesses' testimony, because making "credibility choices" is "precisely what juries are for").