**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-12787

_____

KEITH EDWARDS,
  as Personal Representative of the Estate of
  Jerry Blasingame, deceased,

*Plaintiff-Appellee,*

*versus*

OFFICER J. GRUBBS,
#6416,

*Defendant-Appellant,*

CITY OF ATLANTA,
ATLANTA POLICE DEPT.,

*Defendants.*

_____

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:19-cv-02047-SCJ

_____

2                    Opinion of the Court                    24-12787

———————————————

No. 24-12925

———————————————

KEITH EDWARDS,
  as Personal Representative of the
  Estate of Jerry Blasingame, deceased,

                                          *Plaintiff-Appellant,*

*versus*


OFFICER J. GRUBBS,
#6416,
THE CITY OF ATLANTA,

                                          *Defendants-Appellees,*


ATLANTA POLICE DEPT.,

                                          *Defendant.*


———————————————

Appeals from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:19-cv-02047-SCJ

———————————————

Before JORDAN and NEWSOM, Circuit Judges, and HONEYWELL,[*]

District Judge.

JORDAN, Circuit Judge:

These consolidated appeals involve a single use-of-force incident in Atlanta, Georgia, on July 10, 2018. On that fateful day, City of Atlanta Police Officer Jon Grubbs pulled his taser's trigger, hit Jerry Blasingame in the back, and sent him barreling down a steep embankment that led to a metal utility box on a concrete platform at the bottom. Mr. Blasingame suffered severe injuries when he hit the box and platform, and his guardian sued Officer Grubbs and the City under 42 U.S.C. § 1983. The jury found against Officer Grubbs and the City and awarded significant compensatory and punitive damages. The district court granted the City's motion for judgment as a matter of law, and reduced the award of punitive damages against Officer Grubbs.

We confront a number of issues on appeal, including qualified immunity, municipal liability, and the constitutional limits on punitive damage awards. Based on our review of the record, and with the benefit of oral argument, we affirm in all respects.

---

[*] Honorable Charlene Edwards Honeywell, United States District Judge for the Middle District of Florida, sitting by designation.

**I**

**A**

Around 2:30 p.m. on July 10, 2018, Officer Grubbs and his partner patrolled the streets of Atlanta, Georgia, near an on-ramp to Interstate 20. Traffic was heavy, as it so often is, and the two officers observed Mr. Blasingame—a 65-year-old homeless man—on the side of the roadway reaching into a vehicle and receiving money from the driver. Officer Grubbs' partner parked the police cruiser in the nearby gore. Officer Grubbs then exited the cruiser to confront Mr. Blasingame.

When Mr. Blasingame saw Officer Grubbs, he ran. Officer Grubbs crossed two lanes of traffic and chased Mr. Blasingame on the shoulder of the road. Officer Grubbs ordered Mr. Blasingame to stop, but he continued to flee.

As Officer Grubbs drew closer, Mr. Blasingame crossed over a roadside guardrail. Mr. Blasingame, who was unarmed, did not cause Officer Grubbs to be in imminent fear, and did not say anything to Officer Grubbs during this chase.

Beyond the guardrail, Mr. Blasingame made his way towards an opening in the brush with a steep decline and the highway below. Without verbal warning, Officer Grubbs drew and deployed his taser, hitting Mr. Blasingame in the back. This caused

24-12787                Opinion of the Court                5

Mr. Blasingame to fall down the steep embankment where he hit his head on the concrete platform of a utility box.[1]

Emergency medical services estimated the embankment to be 30 feet long. The distance between the point of impact on the utility box and the guardrail was approximately 23 feet and 9 inches. The angle of the decline was approximately 30 to 40 degrees, as displayed in these photographs and diagrams of the scene:



D.E. 211-31 at 4.

---

[1] The entire chase had taken approximately 45 seconds.



D.E. 211-31 at 9.



---

[2] This diagram was created with generative artificial intelligence.

24-12787                 Opinion of the Court                      7

Emergency medical services transported Mr. Blasingame to Grady Hospital in critical condition. Mr. Blasingame suffered, among other injuries, traumatic brain damage and became quadriplegic due to a spinal injury. Nearly a month later, on August 9, 2018, Officer Grubbs visited Mr. Blasingame—who was still at Grady Hospital—to give him a citation for two misdemeanor offenses: (1) pedestrian solicitation on a roadway in violation of O.C.G.A. § 40-6-97 and (2) obstruction of a law enforcement officer in violation of O.C.G.A. 17-4-6.

This event was not recorded because Officer Grubbs' body-worn camera was in "buffering mode" from 1:48 p.m. to 2:36 p.m. Buffering mode records for up to two minutes at a time and then erases the footage. At 2:36 p.m., Officer Grubbs' body-worn camera was turned off.[3]

The City of Atlanta performed an audit on the use of body-worn cameras by its police officers from November of 2017 through May of 2018. The audit found that officers assigned body-worn cameras captured body-worn camera footage for only 33% of dispatch calls despite a policy that officers shall record when arriving at the scene of a call.

---

[3] Mr. Edwards' experts opined that Officer Grubbs turned off his body-worn camera intentionally. Officer Grubbs reactivated his body-worn camera once he was at the bottom of the embankment, with Mr. Blasingame unconscious, but by then the footage had been erased.

**B**

Keith Edwards, Mr. Blasingame's guardian and conservator, brought this suit against Officer Grubbs and the City of Atlanta, asserting three claims: (1) a Fourth Amendment claim under 42 U.S.C. § 1983 for excessive force against Officer Grubbs and the City; (2) a state-law assault and battery claim against Officer Grubbs; and (3) a state-law respondeat superior claim against the City. The district court granted an unopposed partial summary judgment motion on the respondeat superior claim. The court then entered a "stipulated order for voluntarily dismissal" of the assault and battery claim. Before trial on the § 1983 claims, Officer Grubbs did not move to dismiss or seek summary judgment on qualified immunity grounds.

In August of 2022, the parties proceeded to an eight-day trial on the Fourth Amendment excessive force claims. At the close of the defendants' case, the district court denied Officer Grubbs' Rule 50(a) motion for judgment as a matter of law on qualified immunity grounds. The jury returned a verdict totaling $100 million in favor of Mr. Edwards: $60 million against the City and $40 million against Officer Grubbs. The $40 million award against Officer Grubbs consisted of $20 million in compensatory damages and $20 million in punitive damages.

Post-trial, the district court denied Officer Grubbs' renewed Rule 50(b) motion for judgment as a matter of law on qualified immunity grounds and a subsequent motion for reconsideration. The

court, however, granted Officer Grubbs' motion for remittitur and reduced the punitive damages award against him to $1 million.

The district court granted the City's renewed motion for judgment as a matter of law, overturned the jury's verdict against the City, and held that Mr. Edwards did not prove that the City's policies, customs, or practices were the moving force behind Officer Grubbs' unconstitutional conduct. The court denied Mr. Edwards' Rule 60(b) motion for medical expenses and denied, without prejudice, his motion for attorney's fees. On September 7, 2023, Mr. Blasingame passed away.

Officer Grubbs appeals the district court's denial of qualified immunity in his Rule 50(b) motion for judgment as a matter of law and his motion for reconsideration. Mr. Edwards appeals the district court's grant of the City's Rule 50(b) motion for judgment as a matter of law regarding municipal liability, the reduction of the punitive damages award against Officer Grubbs, the denial of his Rule 60(b) motion for relief from judgment, and the denial of his motion for attorney's fees.

## II

We first consider the district court's denial of judgment as a matter of law to Officer Grubbs based on qualified immunity. Officer Grubbs contends that the court improperly denied him the protections of qualified immunity because, in his view, he did not violate Mr. Blasingame's clearly established Fourth Amendment right to be free from excessive force.

## A

"The denial of qualified immunity is a question of law we review *de novo*." *Grider v. City of Auburn*, 618 F.3d 1240, 1246 n.1 (11th Cir. 2010) (citation omitted). "We also review *de novo* a district court's denial of a Rule 50(b) motion." *Luxottica Grp., S.p.A. v. Airport Mini Mall, Ltd. Liab. Co.*, 932 F.3d 1303, 1310 (11th Cir. 2019) (citation omitted).

"Judgment as a matter of law is appropriate only if the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict." *Id.* (quotation omitted). "We consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party." *Id.* (quotation omitted).

## B

Mr. Edwards asserts that Officer Grubbs did not mention qualified immunity until the middle of trial and thus has "waived" its protections. *See* Br. for Appellee at 30. "Although jurists often use the words interchangeably, forfeiture is the failure to make the timely assertion of a right; waiver is the intentional relinquishment or abandonment of a known right." *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004) (internal quotation marks omitted and alterations adopted) (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)).

Although "qualified immunity questions *should* be resolved at the earliest possible stage of a litigation[,]" *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987) (emphasis added), it is not a jurisdictional defense that must be raised *sua sponte*. *See Nevada v. Hicks*,

533 U.S. 353, 373 (2001). "Qualified immunity," in other words, "is an affirmative defense that may be waived." *Bogle v. McClure*, 332 F.3d 1347, 1355 n.5 (11th Cir. 2003) (collecting cases). For example, it "must be pled, and if it is not, it is deemed waived." *Skrtich v. Thornton*, 280 F.3d 1295, 1306 (11th Cir. 2002) (citing *Moore v. Morgan*, 922 F.2d 1553 (11th Cir.1991)). Here, Officer Grubbs pled qualified immunity as a defense in his answer but did not move to dismiss or for summary judgment on qualified immunity grounds.

Ordinarily, "[a] defendant can forfeit an affirmative defense by failing to raise it, and 'an affirmative defense, once forfeited, is excluded from the case.'" *Patel v. Hamilton Med. Ctr., Inc.*, 967 F.3d 1190, 1195 (11th Cir. 2020) (quoting *Wood v. Milyard*, 566 U.S. 463, 470 (2012)) (alterations adopted). For qualified immunity, "a defendant is entitled to have any evidentiary disputes upon which the qualified immunity defense turns decided by the jury so that the court can apply the jury's factual determinations to the law and enter a post-trial decision on the defense." *Johnson v. Breeden*, 280 F.3d 1308, 1318 (11th Cir. 2002), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389 (2015). "When the case goes to trial, the jury itself decides the issues of historical fact that are determinative of the qualified immunity defense, but the jury does not apply the law relating to qualified immunity to those historical facts it finds; that is the court's duty." *Id.* (citations omitted).

Special interrogatories can be used when there are issues of fact that may affect a qualified immunity defense. *See Simmons v. Bradshaw*, 879 F.3d 1157, 1164 (11th Cir. 2018). In this case, Officer

Grubbs did not request any special interrogatories. The verdict form asked the jury only one threshold question: "Do you find from a preponderance of the evidence [ ] [t]hat Jerry Blasingame was subjected to excessive or unreasonable force by Defendant Officer Jon Grubbs?" D.E. 163 at 1.

After Mr. Edwards rested his case, Officer Grubbs moved for judgment as a matter of law under Rule 50(a), arguing that he was entitled to qualified immunity. The district court declined to grant Officer Grubbs qualified immunity at that time; the court then denied the motion for judgment as a matter of law at the close of the defendants' case. Officer Grubbs later renewed his motion pursuant to Rule 50(b). The court again rejected Officer Grubbs' qualified immunity defense and denied the motion.

We reject Mr. Edwards' contention that Officer Grubbs waived or forfeited his qualified immunity defense. We do so because qualified immunity—which is both an immunity from suit and a defense to liability—can be raised for the first time at trial (assuming, of course, that it has been properly pled). *See, e.g., Cygnar v. City of Chicago*, 865 F.2d 827, 842 n.16 (7th Cir. 1989); *Spann v. Rainey*, 987 F.2d 1110, 1114 (5th Cir. 1993); *White v. Bibb Cnty.*, 28 F. Supp. 2d 1374, 1382 (M.D. Ga. 1998). *Cf. Johnson*, 280 F.3d at 1317 ("Defendants who are not successful with their qualified immunity defense before trial can re-assert it at the end of the plaintiff's case in a Rule 50(a) motion.") (citations omitted).

## C

The doctrine of qualified immunity shields government officials who perform discretionary functions from civil liability when their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (internal quotation marks and citation omitted). "To be eligible for qualified immunity, a government official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016) (citing *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)). Here, Mr. Edwards does not dispute that Officer Grubbs was acting within the scope of his discretionary authority when he discharged his taser. *See Hinson v. Bias*, 927 F.3d 1103, 1116 (11th Cir. 2019) (police officers act within their discretionary authority when they are "on duty . . . conducting arrest and investigative functions").

The burden therefore shifts to Mr. Edwards to establish that qualified immunity does not apply. *See Bailey*, 843 F.3d at 480. He can do this by proving (1) a violation of a constitutional right (2) that "was clearly established at the time of [Officer Grubbs'] alleged misconduct." *Underwood v. City of Bessemer*, 11 F.4th 1317, 1328 (11th Cir. 2021) (internal quotation marks omitted). Mr. Edwards "must satisfy both prongs of the analysis to overcome a defense of qualified immunity." *Bailey*, 843 F.3d at 480.

**1**

The Fourth Amendment forbids the use of excessive force to apprehend a suspect. *See* U.S. Const. amend. IV; *Charles v. Johnson*, 18 F.4th 686, 699 (11th Cir. 2021). The Fourth Amendment's objective reasonableness standard governs whether a law enforcement officer's use of force during an arrest or a seizure was excessive. *See, e.g., Graham v. Connor*, 490 U.S. 386, 395 (1989); *Tennessee v. Garner*, 471 U.S. 1, 9 (1985). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).

Because this inquiry is an objective one, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397 (citations omitted). We have distilled the evaluation of an officer's use of force into six factors:

> (1) the severity of the suspect's crime, (2) whether the suspect poses an immediate threat of harm to others, (3) whether the suspect is actively resisting arrest or trying to flee, (4) the need for the use of force, (5) the relationship between the need for force and the amount of force used, and (6) how much injury was inflicted.

24-12787                 Opinion of the Court                 15

*Wade v. Daniels*, 36 F.4th 1318, 1325 (11th Cir. 2022) (citing *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015) (per curiam)).

If the force was lethal, "that is, force that an officer knows to create a substantial risk of causing death or serious bodily harm[,] . . . we must also consider whether the officer" had "'probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others or that he has committed a crime involving the infliction or threatened infliction of serious physical harm" and whether the officer gave "some warning about the possible use of deadly force, if feasible." *Bradley v. Benton*, 10 F.4th 1232, 1240–41 (11th Cir. 2021) (internal quotation marks and citations omitted). *See also Garner*, 471 U.S. at 11–12 ("[I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.").

The use of a taser is not *per se* deadly force. We have said, however, that "tasing a person who is at an elevated height may come with a substantial risk of serious bodily harm or death." *Bradley*, 10 F.4th at 1241 ("join[ing] many other courts" to consider the issue). When a suspect is in a vulnerable and dangerous elevated position, the use of a taser becomes equivalent to deadly force because it "has the capacity to completely incapacitate [the] individual." *Jones v. Treubig*, 963 F.3d 214, 229 (2d Cir. 2020). Here Mr.

Blasingame was at the top of a 30-foot decline with a slope of 30 to 40 degrees and with dangers—a highway and a concrete structure—below. Specifically, Mr. Blasingame was running down a steep embankment when Officer Grubbs tased him in the back. Although Officer Grubbs argues that a reasonable officer could not see the steep embankment and danger from his perspective, this assertion is contrary to other evidence adduced at trial.

Viewing the evidence in the light most favorable to Mr. Edwards, we conclude that there was sufficient evidence from which a reasonable jury could find a Fourth Amendment violation. *See Chaney v. City of Orlando*, 483 F.3d 1221, 1229 (11th Cir. 2007).

First, Mr. Blasingame did not commit (and was not suspected of committing) a serious or dangerous crime. The evidence at trial at most established that Mr. Blasingame committed the misdemeanor offense of panhandling. *See* O.C.G.A. § 40-6-97(b). Officer Grubbs did not have "probable cause to believe that [Mr. Blasingame] committed a crime involving the infliction or threatened infliction of serious physical harm." *Garner*, 471 U.S. at 11.

Second, Mr. Blasingame was not an immediate threat to Officer Grubbs or his partner. Mr. Blasingame may have posed a threat to the drivers on the highway and might have put himself in danger had he run onto the highway, but he did not do so. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005) (considering the extent to which the suspect poses a threat to himself or herself under the second factor). The evidence at trial uncontrovertibly demonstrated that Mr. Blasingame remained on the side

of the road before and during the interaction with the officers. He did not act erratically or run into the road at any point.

Importantly, Officer Grubbs testified that he never saw a weapon on Mr. Blasingame. And he acknowledged that Mr. Blasingame never threatened him nor put him in "imminent fear" of his life. *See* D.E. 197 at 56, 62. Officer Grubbs does not and cannot argue that he had probable cause to believe that Mr. Blasingame posed "a threat of serious physical harm" to him or his partner. *See Bradley*, 10 F.4th at 1240.

Officer Grubbs did testify that Mr. Blasingame made a "swinging-type motion" towards him, without making contact. *See* D.E. 197 at 59:1–61:8. But the jury was not required to believe Officer Grubbs on this point, even if his testimony was uncontroverted. *See, e.g., Hawk v. Olson*, 326 U.S. 271, 279 (1945); *Tyler v. Beto*, 391 F.2d 993, 995 (5th Cir. 1968). In reviewing the denial of judgment as a matter of law, we assume that the jury resolved all logical inferences and all credibility determinations in Mr. Edwards' favor. *See SEC v. Ginsburg*, 362 F.3d 1292, 1297 (11th Cir. 2004).

Third, the evidence at trial showed that Mr. Blasingame ran away from the officers. Although Mr. Blasingame fled, he was never given a chance to finally comply before force was used. Officer Grubbs admitted that he never gave any verbal warning before deploying his taser.

Fourth, some use of force was minimally necessary to prevent Mr. Blasingame's escape, as he showed no signs of ending the chase. *See* D.E. 197 at 77 (Officer Grubbs testified that he "deployed

the Taser to terminate the pursuit [and] to prevent [Mr. Blasingame] from entering the highway"). But this factor does not weigh heavily in Officer Grubbs' favor because the force was more than minimal.

Fifth, the relationship between the need for force and the amount of force used tilts in Mr. Edwards' direction. The amount of force used by an officer "must be reasonably proportionate to the need for that force." *Lee*, 284 F.3d at 1198. When a non-dangerous and unarmed suspect takes flight, deadly force is disproportionate. *See Garner*, 471 U.S. at 11. Various of our cases reflect this principle. *See Bradley*, 10 F.4th at 1243 (using "this level of force to stop an unarmed man who was not suspected of committing a violent crime from fleeing on foot . . . is excessive"); *Salvato v. Miley*, 790 F.3d 1286, 1294 (11th Cir. 2015) ("Using deadly force, without warning, on an unarmed, retreating suspect is excessive."); *Vaughan v. Cox*, 343 F.3d 1323, 1332–33 (11th Cir. 2003) (deadly force may not be used when the only "danger presented by [the suspects'] continued flight was the risk of an accident during the pursuit").

Sixth, and finally, the injuries inflicted were severe. Mr. Blasingame's skull was crushed, and he was rendered quadriplegic. Due to his spinal cord injury, Mr. Blasingame could not move anything below his neck.

Considering and weighing these factors, we conclude that a reasonable jury could find that Officer Grubbs violated Mr.

24-12787                 Opinion of the Court                       19

Blasingame's Fourth Amendment right to be free from excessive force. Therefore, the first qualified immunity prong is satisfied.

**2**

"Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

> A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

*Gilmore v. Ga. Dep't of Corr.*, 144 F.4th 1246, 1258 (11th Cir. 2025) (en banc) (internal quotation marks and citation omitted). "Under the third method, a general constitutional rule may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)) (internal quotation marks omitted and alterations adopted).

We held in *Bradley* that tasing a non-dangerous and unarmed fleeing suspect on an elevated surface, under similar circumstances—the suspect was atop an eight-foot wall when shot—is "obviously unconstitutional even absent a case directly on point."

20                  Opinion of the Court                  24-12787

*Bradley*, 10 F.4th at 1244. As in *Bradley*, Mr. Blasingame "posed no immediate threat" to Officer Grubbs. *See id.* And "[h]e was not suspected of committing a crime involving the infliction of serious physical harm." *Id.* "Yet, without any warning, Officer [Grubbs] applied deadly force to prevent [his] escape from the [ ] stop on foot." *Id.*

Officer Grubbs argues that *Bradley*, decided in 2021, could not clearly establish the law here because it post-dates his use of force in July of 2018. *See Mercado*, 407 F.3d at 1159 ("Any case law that is 'materially similar' to the facts in the case at hand must predate the officer's alleged improper conduct and 'truly compel the conclusion that the plaintiff had a right under federal law.'"). The problem with this argument is that *Bradley* was an obvious clarity case and held that the conduct—tasing a non-dangerous and unarmed suspect on an elevated surface merely to prevent flight—was obviously unconstitutional to any reasonable officer even in the absence of caselaw directly on point. *See Bradley*, 10 F.4th at 1244 (first citing *Cantu v. City of Dothan*, 974 F.3d 1217, 1229 (11th Cir. 2020), and then citing *Mercado*, 407 F.3d at 1159). The use of force in *Bradley*, moreover, took place in August of 2015. *See Bradley v. Benton*, No. 1:18-CV-01518-CAP, 2018 WL 8949775, at *1 (N.D. Ga. Oct. 30, 2018) (providing the date of the incident). What was clearly obvious to a reasonable officer in August of 2015 was also clearly obvious to Officer Grubbs in July of 2018.

Officer Grubbs asserts that the wall in *Bradley* is so different in kind from the embankment here that *Bradley* cannot apply. We

disagree. First, Officer Grubbs' characterization of the terrain as a "grassy hill," Br. for Appellant at 30, is not determinative. What matters is that the embankment had a slope of 30 to 40 degrees and a drop of about 24 feet from the point of impact. Second, the characterization ignores that Mr. Blasingame was running with his back to Officer Grubbs when he was hit, and had no opportunity to prepare himself for a fall. Third, we need not find that the facts of *Bradley* are identical to the ones here because we conclude, as did *Bradley*, that the obvious clarity principle carries the day.[4]

In sum, the Fourth Amendment violation here—deployment of a taser against a non-violent, non-dangerous, and unarmed suspect fleeing down a steep embankment—was one of obvious clarity. *See Gilmore*, 144 F.4th at 1258; *Bradley*, 10 F.4th at 1244. *Cf. Peroza-Benitez v. Smith*, 994 F.3d 157, 167–68 (3d Cir. 2021) (holding, under obvious clarity method, that "[t]he Fourth Amendment right of an injured, visibly unarmed suspect to be free from temporarily paralyzing force while positioned at a height that carries with it a risk of serious injury" was clearly established in October of 2015). Thus, we affirm the district court's denial of qualified immunity to Officer Grubbs and uphold the liability verdict against him.[5]

---

[4] We acknowledge that in *Stewart v. Garcia*, 139 F.4th 698, 707 (8th Cir. 2025), the Eighth Circuit held that a suspect's right to be free from the use of deadly force (a taser) while on an eight-or-nine-foot fence was not clearly established in April of 2018. *Stewart*, however, did not consider the obvious clarity method and is in any event contrary to *Bradley*. *See* 139 F.4th at 707–08.

[5] Officer Grubbs also appeals the order denying his motion for reconsideration of the denial of his Rule 50(b) motion asserting qualified immunity. Because

## III

Now to the City of Atlanta. Mr. Edwards challenges the district court's entry of judgment as a matter of law to the City on his municipal liability claim under § 1983.

We review a district court's entry of judgment as a matter of law *de novo*. *See Brown v. R.J. Reynolds Tobacco Company*, 38 F.4th 1313, 1323 (11th Cir. 2022). We apply the same standards as the district court, meaning "we consider all the evidence, and the inferences drawn therefrom, in the light most favorable to the nonmoving party." *Advanced Bodycare Sols., LLC v. Thione Int'l, Inc.*, 615 F.3d 1352, 1360 (11th Cir. 2010) (citing *Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir. 1989)).

"Our task is to determine whether the evidence was 'legally sufficient' to support the jury's verdict." *Taxinet Corp. v. Leon*, 114 F.4th 1212, 1223 (11th Cir. 2024) (first citing Rule 50(b), and then citing *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016)). "This standard is heavily weighted in favor of preserving the jury's verdict." *Taxinet*, 114 F.4th at 1223 (quoting *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1226 (11th Cir. 2012)) (internal quotation marks omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a court, and we must disregard all evidence favorable to the

---

the denial of qualified immunity to Officer Grubbs was correct, the district court did not err in denying his motion for reconsideration.

moving party that the jury is not required to believe." *Id.* (quoting *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004)) (internal quotation marks omitted and alterations adopted). Ultimately, "we will 'disturb the jury's verdict only when there is no material conflict' as to the evidence and where no reasonable juror could agree to the verdict." *Id.* (quoting *Brown*, 38 F.4th at 1323).

## A

A plaintiff may sue a municipality directly under § 1983 when one of its policies, customs, or practices causes a constitutional injury. *See Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978). "The policy may be a governmental 'custom' which has not received formal approval through the official decisionmaking channel." *Cannon v. Taylor*, 782 F.2d 947, 950 (11th Cir. 1986). "A custom is a practice so settled and permanent that it takes on the force of law." *Id.* (citing *Monell*, 436 U.S. at 690–91).

A plaintiff like Mr. Edwards must demonstrate, however, "that the municipality was the 'moving force' behind the injury." *Barnett v. Macarthur*, 956 F.3d 1291, 1296 (11th Cir. 2020) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997)). The "municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691. This is because "the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable

unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* Put differently, a local government "will be liable under [§] 1983 only for acts for which the local government is actually responsible." *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1027 (11th Cir. 2001) (en banc) (citing *Turquitt v. Jefferson Cnty.*, 137 F.3d 1285, 1287 (11th Cir. 1998)).

The *Monell* claim here hinges on the City's purported failure to enforce its body-worn camera policy. A failure to train or supervise must "reflect[ ] a 'deliberate' or 'conscious' choice by a municipality." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). "To establish a deliberate or conscious choice or such deliberate indifference, a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir 1998).

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). But "a single constitutional violation may result in municipal liability when there is 'sufficient independent proof that the moving force of the violation was a municipal policy or custom.'" *Vineyard v. Cnty. of Murray*, 990 F.2d 1207, 1212 (11th Cir. 1993) (quoting *Gilmere v. City of Atlanta,* 774 F.2d 1495, 1504 n.10 (11th Cir. 1985) (en banc)).

**B**

Mr. Edwards contends that the district court erred by concluding that there was insufficient evidence to show that "any policies and procedures relating to [body-worn cameras] caused the constitutional violation at issue." D.E. 177 at 21. Mr. Edwards also faults the court for undermining his "novel" theory that the failure to enforce the body-worn camera policy could cause excessive force violations.

In this case, there was no evidence of a pattern of similar constitutional violations (i.e., uses of excessive force) driven by the failure of City police officers to use or activate their body-worn cameras. Viewing the evidence in the light most favorable to Mr. Edwards, the evidence showed that the body-worn cameras of the City's officers were used only 33% of the time on dispatch calls. The evidence also showed that officers were not frequently disciplined for failing to adhere to the body-worn camera policy. Accepting that evidence, the missing causal link is that fostering an environment where body-worn cameras are not properly used, without more, does not indicate that the City fostered an environment where officers disabled the cameras to use excessive force and get away with it. In other words, the failure to present evidence of similar constitutional violations by officers who were not disciplined for noncompliance with the body-worn camera policy is fatal to the argument that the City acted with deliberate indifference to ignore unrecorded use-of-force incidents. *See Gold*, 151 F.3d at 1351.

One of Mr. Edwards' experts opined that the use of body-worn cameras *generally* prevents excessive force. That opinion, however, is too far removed to show that the City acted with deliberate indifference. Reviewing the expert testimony and the audit on which the expert relied, there is no connection between the 66% of dispatch calls that were not recorded and any use-of-force incidents that took place during the same time frame as the audit. Further, the data showed that "[l]ess than 1% (1,480) of the 491,753 videos uploaded between November 2016 and May 2018 were categorized as use of force incidents." D.E. 211-30 at 22. In the City's random sample of 150 videos, only one use-of-force incident was miscategorized. Without more, Mr. Edwards' expert testimony about general policing trends does not amount to deliberate indifference about a culture of body-worn camera misuse and a corresponding culture of excessive force. *See Gold*, 151 F.3d at 1351.

The single constitutional violation here does not give rise to *Monell* liability. There is not "sufficient independent proof that the moving force of the violation was a municipal policy or custom." *Vineyard*, 990 F.2d at 1212. We find no evidence that Officer Grubbs turned off his body-worn camera that day because he planned to use excessive force and knew or believed that he would not be disciplined for the failure to document his actions. Moreover, there was no evidence of a previous incident where Officer Grubbs failed to use his body-worn camera to hide an excessive use of force—putting the City on notice that he was inadequately trained or supervised. Finally, although its action was delayed, the City

disciplined Officer Grubbs for the failure to activate his body-worn camera on the day in question.

The evidence, when viewed in the light most favorable to Mr. Edwards, does not reflect a deliberate or conscious choice by the City to allow excessive force violations by failing to discipline officers for deactivated body-worn cameras. We affirm the district court's grant of judgment as a matter of law to the City.

## IV

We next consider the district court's reduction of the punitive damages award as to Officer Grubbs. "We review *de novo* the constitutionality of a punitive damages award, deferring to the district court's findings of fact unless clearly erroneous." *Kerrivan v. R.J. Reynolds Tobacco Co.*, 953 F.3d 1196, 1204 (11th Cir. 2020) (citing *Action Marine, Inc. v. Cont'l Carbon Inc.*, 481 F.3d 1302, 1318 (11th Cir. 2007)).

The three guideposts from *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), guide our review of a punitive damage award for constitutional excessiveness. *See Johansen v. Combustion Eng'g., Inc.*, 170 F.3d 1320, 1335 (11th Cir. 1999).

"First, we consider the degree of reprehensibility of the defendant's misconduct." *Cote v. Philip Morris USA, Inc.*, 985 F.3d 840, 847 (11th Cir. 2021) (quoting *Action Marine, Inc.*, 481 F.3d at 1318). We have said that "the degree of reprehensibility of the defendant's conduct is essentially a judgment about facts." *Johansen*, 170 F.3d at 1335. "Such judgments are properly the role of the district court[.]" *Id.* "If a district court's finding regarding the defendant's degree of

reprehensibility is not supported by the record or is contrary to the evidence, it is 'clearly erroneous.'" *Id.* (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)).

"Second, we look at the ratio of the punitive damages award to the actual or potential harm suffered by the plaintiff." *Cote*, 985 F.3d at 847. We have described the ratio as a "historical fact." *Johansen*, 170 F.3d at 1334. So we "accept [the district court's] finding unless it is clearly erroneous." *Id.*

"Third, we look at the difference between the punitive damages award and the civil [and criminal] penalties authorized or imposed in comparable cases." *Cote*, 985 F.3d at 847. As to this guidepost, "the selection of the most appropriate point of comparison—actual fine imposed [or] the maximum possible penalty or penalties in similar cases—is an issue of law." *Johansen*, 170 F.3d at 1334.

We "determine *de novo* whether the punitive damage award is constitutionally excessive when measured by these guideposts." *Id.* at 1335. "[T]he essential legal issue is whether the relevant facts of this case, as indicated by the various *BMW* factors, constitutionally support the punitive damage award, i.e., do these facts indicate that [the defendant] had adequate notice that its conduct might subject it to this punitive damage award[?]" *Id.* The end goal of the guideposts is to calculate "the maximum the Constitution permits" in each case. *See id.* at 1339.

## A

Mr. Edwards argues that Officer Grubbs' motion for remittitur was untimely, and therefore the district court procedurally erred by considering it.

As a prefatory matter, Officer Grubbs brought his motion under Rule 59(e), or in the alternative, under Rule 60(b)(6). Mr. Edwards argues that the motion should be treated as a Rule 50 or Rule 59 motion, both of which carry a 28-day deadline following the entry of judgment. *See* Fed R. Civ. P. 50(b), 59(b). We agree and construe the motion as a Rule 50 motion because "a court proceeds under Rule 50, not Rule 59, in the entry of judgment for a constitutionally reduced award." *Johansen*, 170 F.3d at 1331.

Rule 50(b) provides as follows:

> No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.

On September 22, 2022, the district court entered its post-trial judgment. In April of 2023, both sides appealed. On February 15, 2024, we dismissed that appeal for lack of jurisdiction:

> We do not have jurisdiction over this appeal, however, because there is no final judgment. Final judgment generally requires that the district court resolve "conclusively the substance of all claims, rights, and liabilities of all parties to an action." *Sanchez v. Disc.*

*Rock & Sand, Inc.*, 84 F.4th 1283, 1291 (11th Cir. 2023) (emphasis omitted) (quotation omitted). And Rule 41 "provides only for the dismissal of an entire action," not a single claim. *Rosell v. VMSB, LLC*, 67 F.4th 1141, 1143 (11th Cir. 2023). So the district court's Rule 41 dismissal of only Count II is invalid, and "a final judgment was never rendered." *Id.* We **DISMISS** Grubbs's and Edwards's appeals for lack of jurisdiction.

*Edwards v. Grubbs*, No. 22-13261, 2024 WL 630999, at *1 (11th Cir. Feb. 15, 2024).

On remand, the district court entered final judgment on May 2, 2024, based on an amended complaint dismissing the state-law assault and battery claim. The court ordered the parties to file any post-judgment motions within 14 days, and Officer Grubbs met this deadline. Because there was no final judgment rendered at the time of the first appeal, and because the text of Rule 50(b) begins the clock "after the entry of the judgment," Fed. R. Civ. P. 50(b), Officer Grubbs' motion was timely. *See Weatherly v. Ala. State Univ.*, 728 F.3d 1263, 1271 (11th Cir. 2013) (stating that "Federal Rules of Civil Procedure 50(b) and 59(b) require the motion to be filed within 28 days after the entry of *final* judgment") (emphasis added).

**B**

Mr. Edwards, who seeks reinstatement of the full $20 million punitive damages award, contends that the district court misapplied all three *BMW* guideposts: (1) the reprehensibility of Officer

Grubbs' conduct; (2) the ratio of the punitive damages award to the compensatory damages; and (3) the differential between comparable criminal or civil penalties. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW*, 517 U.S. at 575). Officer Grubbs does not address the three guideposts in his brief.

**1**

"Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Smith v. Wade*, 461 U.S. 30, 46–47 (1983) (quotation marks and citation omitted). "The most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *State Farm*, 538 U.S. at 419 (quoting *BMW*, 517 U.S. at 575).

The Supreme Court has instructed courts to determine the reprehensibility of a defendant by considering whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.* (citing *BMW*, 517 U.S. at 576–77). "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *Id.*

The district court found that Officer Grubbs' conduct was reprehensible but not overly egregious. *See* D.E. 270 at 26–27. This finding—to which we owe deference—is supported by the record. *See Johansen*, 170 F.3d at 1335. In considering the degree of reprehensibility, "we will not second guess the judge who sat through the trial, heard the testimony, observed the witnesses and had the 'unique opportunity to consider the evidence in the living courtroom context' while we have only the 'cold paper record.'" *Id.* (quoting *Gasperini v. Ctr. for Humans.*, 518 U.S. 415, 437 (1996)).

The evidence and testimony at trial revealed that Officer Grubbs tased Mr. Blasingame in the back, without warning, and sent him plummeting down the embankment for nearly twenty-four feet. The harm to Mr. Blasingame was physical, and he suffered traumatic brain damage and quadriplegia.

There is also evidence, however, that this constitutional violation was isolated and not motivated by intentional malice towards Mr. Blasingame. The entire chase and use of force lasted less than one minute. In addition, Officer Grubbs did not try to cover up what he had just done. Instead, he called for an ambulance and notified his supervisor of the use of force. Nonetheless, as the district court found, Officer Grubbs' conduct evinced a reckless indifference to the rights of others. *See Smith*, 461 U.S. at 46–47.

The district court's findings underlying the reprehensibility sub-factor were not erroneous. Officer Grubbs' conduct, though reprehensible, was not so egregious as to support a $20 million award.

**2**

Next, we take up the ratio between the punitive damages and the compensatory damages. "[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425. The Supreme Court "has indicated that a ratio greater than 4:1 between punitive and compensatory damages will likely be close to the line of constitutional impropriety." *Williams v. First Advantage LNS Screening Sols., Inc.*, 947 F.3d 735, 750 (11th Cir. 2020). Nevertheless, there is not "a bright-line ratio which a punitive damages award cannot exceed." *State Farm*, 538 U.S. at 425. "If the ratio of actual to punitive damages is too great, it is an indication that the defendant did not have adequate notice that its conduct might subject it to an award of this size." *Johansen*, 170 F.3d at 1336 (citing *BMW*, 517 U.S. at 574).

Mr. Edwards argues that we should consider the jury's original verdict of $80 million in compensatory damages and $20 million in punitive damages, leaving him with a presumptively constitutional ratio. But our *Monell* ruling renders the jury's $60 million award against the City legally invalid. *See United States v. De La Mata*, 535 F.3d 1267, 1276–77 (11th Cir. 2008) ("Where a judgment is vacated or set aside by a valid order or judgment, it is entirely destroyed and the rights of the parties are left as though no such judgment had ever been entered.") (quoting 49 C.J.S. Judgments § 357 (2008)).

We discern no clear error in the district court's conclusion that the proper ratio under this guidepost is 1:1—$20 million in compensatory damages to $20 million in punitive damages. *See Johansen*, 170 F.3d at 1334 (stating that the ratio is a "historical fact" which we must accept "unless it is clearly erroneous"). And we agree with the court that "the ratio of compensatory and punitive damages in this case must necessarily account for the high compensatory award." D.E. 270 at 29.

The 1:1 ratio is not presumptively unconstitutional: "When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425.

Admittedly, it is "[n]ot eas[y]" to determine whether the disparity between punitive damages and compensatory damages is "too great." *Williams*, 947 F.3d at 754. But we agree with other courts which have explained that "the ratio without the amount 'tells us little of value.'" *Saccameno v. U.S. Bank Nat'l Ass'n*, 943 F.3d 1071, 1089 (7th Cir. 2019) (quoting *Payne v. Jones*, 711 F.3d 85, 103 (2d Cir. 2012)). On this record, we conclude that the 1:1 ratio is neutral given that we know of no courts that have reduced a punitive damages award below such a ratio. *Cf. Epic Sys. Corp. v. Tata Consultancy Servs.*, 980 F.3d 1117, 1145 (7th Cir. 2020) ("In sum, considering the factors together, we conclude that the maximum permissible award of punitive damages in this case is $140 million—a 1:1 ratio relative to the compensatory award.").

**3**

Finally, we compare the punitive damages award to potential civil or criminal penalties for Officer Grubbs' conduct. *See BMW*, 517 U.S. at 575. The appropriate points of comparison include the actual fine imposed by statute or the outer bounds of punitive damages awarded in similar cases. *See Johansen*, 170 F.3d at 1334.

"Whether a defendant had constitutionally adequate notice that his conduct might result in a particular damage award depends in large part upon the available civil and criminal penalties the state provides for such conduct." *Id.* at 1337. Mr. Edwards does not address the district court's reliance on the $250,000 damages cap for Georgia tort actions and the identical $250,000 limit for federal criminal fines for a conviction for deprivation of rights under 18 U.S.C. § 242. *See* O.C.G.A. § 51-12-5.1(g); 18 U.S.C. § 3571(b)(3). These statutory comparators weigh in favor of reducing the $20 million punitive damages award significantly.

Moreover, the award of $20 million here exceeds punitive damages awarded and upheld in comparable cases. *See, e.g., Stewardson v. Titus*, 126 F.4th 1264, 1271 (7th Cir. 2025) (upholding an $850,000 punitive damages award against a single officer in a brutal police beating); *Masters v. City of Indep.*, 998 F.3d 827, 842 (8th Cir. 2021) (holding that "the district court correctly found the jury's initial punitive damages award [of $1,000,000] was disproportionate," and remanding for "entry of a judgment imposing $425,700 in punitive damages" where the plaintiff suffered an anoxic brain injury

after the officer tased him for a prolonged period, rendering him unresponsive, and then "dropp[ed] him face-first onto concrete"); *Casillas-Diaz v. Palau*, 463 F.3d 77, 80 (1st Cir. 2006) (upholding a jury award of a total of $1,000,000 in punitive damages in an excessive physical force case ($250,000 against each of the four defendant-officers)); *O'Neill v. Krzeminski*, 839 F.2d 9, 14 (2d Cir. 1988) (upholding a $185,000 punitive damages award for the brutal beating by several police officers of a defenseless plaintiff at a police station).[6]

Canvassing the case law reveals an outlier: *Estate of Moreland v. Dieter*, 395 F.3d 747 (7th Cir. 2005). In *Dieter*, the Seventh Circuit upheld a $27.5 million punitive damages award ($15 million against one officer and $12.5 million against the other). In that case, a prisoner died after the two officers severely beat him, left him to die, and attempted to cover their actions up. *See id.* at 751–53. Even this award against each officer was less than the $20 million here against a single officer, and the total award was less than the compensatory damages of $29 million. *See id.* at 756–78. The degree of reprehensibility and the ratio make *Dieter* distinguishable in material ways.

---

[6] Adjusting the two awards in comparable excessive force cases prior to this decade for inflation still leaves these awards well below $20 million: $1 million in 2006 is equivalent to approximately $1.6 million in 2025, *see Casillas-Diaz*, 463 F.3d at 80, and $185,000 in 1988 is worth approximately $500,000 in 2025, *see O'Neill*, 839 F.2d at 14. *See* U.S. Dep't of Lab., Bureau of Lab. Stat., *CPI Inflation Calculator* (last accessed Jan. 6, 2026), https://www.bls.gov/data/inflation_calculator.htm.

Mr. Edwards also identifies *Reeves v. Town of Cottageville*, No. 2:12-cv-02765 (D.S.C. 2014), and *S.T. v. Isbell*, No. 2:09-cv-616-MHT (M.D. Ala. 2010), as apt comparators. We disagree. *Reeves* was a § 1983 excessive force case where a Town of Cottageville police officer confronted and killed the Town's former mayor. *See Reeves*, No. 2:12-cv-02765, D.E. 1-1 at 6–7. The jury awarded the plaintiff $60 million in punitive damages against the Town. *See* No. 2:12-cv-02765, D.E. 163 at 2. The parties settled while the motion to reduce this verdict was pending. *See* No. 2:12-cv-02765, D.E. 205. *Isbell* was a § 1983 case in which an Alabama law enforcement officer and a girls' softball coach for a municipal entity subjected the plaintiff, a minor, to years of sexual abuse. *See Isbell*, No. 2:09-cv-616, D.E. 1; D.E. 45. The district court entered default judgment on liability against the officer and held a trial on the issue of damages. *See* No. 2:09-cv-616, D.E. 36; D.E. 47. The jury awarded the plaintiff $10 million in punitive damages. *See* No. 2:09-cv-616, D.E. 51. The officer never challenged this award.

Neither of these cases resulted in a judicial opinion analyzing or upholding the constitutionality of the punitive damages awards. Thus, they are of little persuasive value.

This last *BMW* guidepost weighs in favor of concluding that Office Grubbs did not have constitutionally adequate notice that his conduct may result in a $20 million punitive damages award against him. Some meaningful reduction is warranted. *See Johansen*, 170 F.3d at 1337.

**4**

In sum, the *BMW* guideposts lead us to affirm the district court's reduction of the $20 million punitive damage award. The three guideposts indicate that some award of punitive damages is appropriate and constitutional, but $20 million exceeds the bounds of due process. The degree of reprehensibility—not overly egregious behavior—and the size of comparable penalties and awards will not permit such an award here.

The difficulty, we candidly admit, is trying to figure out the maximum amount of punitive damages that a jury could have constitutionally awarded on this record. Why, for example, shouldn't the reduced award be $2 million or $5 million instead of $1 million? The district court explained that a $1 million punitive damages award would "serve[ ] the purposes of punitive damages" without "surpassing 'the zone of arbitrariness that violates the Due Process Clause.'" D.E. 270 at 36 (quoting *BMW*, 517 U.S. at 568). Maybe the district court was right, but it is not intuitively clear to us that $1 million is the constitutionally maximum award. Fortunately, we need not try to figure out ourselves whether a punitive damages award of $2 million or higher would have been constitutionally permissible. On appeal, Mr. Edwards has taken an all-or-nothing approach; he contends that *no* reduction was appropriate based on the *BMW* guideposts because the $20 million award is constitutional, and he does not suggest any alternative lower figure. On appeal, Officer Grubbs also does not address whether a different figure (such as $250,000, his alternative request below) would be constitutional.

"In our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). This principle requires that "we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *See id.* (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)). In other words, "courts 'call balls and strikes'; they don't get a turn at bat." *Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (quoting *Lomax v. Ortiz-Marquez*, 590 U.S. 595, 599 (2020)). In the absence of adversarial briefing, we decline to weigh the potential constitutionality of awards between $1 million and $20 million. Accordingly, we affirm the reduction of the punitive damages award to $1 million.

## V

We next consider the denial of Mr. Edwards' Rule 60(b) motion for relief from judgment. "We review the denial of a motion for relief from judgment under Rule 60(b) for an abuse of discretion." *Howell v. Sec'y, Fla. Dep't of Corr.*, 730 F.3d 1257, 1260 (11th Cir. 2013). Mr. Edwards argues that the district court erred by concluding that the City was not statutorily responsible for Mr. Blasingame's medical bills and denying his motion for relief from judgment on his claim under O.C.G.A. § 42-5-2.

In Georgia, § 42-5-2 proscribes the responsibilities of governmental units over inmates in custody. It states that "it shall be the responsibility of the [governmental entity] to bear the costs of any reasonable and necessary emergency medical and hospital care which is provided to any inmate. . . ." § 42-5-2(b). As a matter of

state law, Georgia courts have generally recognized a claim for a breach of the statutory duty to provide medical care under § 42-5-2—without stating that such claims require another statutory right of action—but have continually held that such claims must overcome sovereign immunity and ante litem notice requirements to proceed. *See, e.g., Howard v. City of Columbus*, 521 S.E.2d 51, 58 (Ga. Ct. App. 1999); *Bd. of Regents v. Putnam Cnty.*, 506 S.E.2d 923, 924 (Ga. Ct. App. 1998); *Graham v. Cobb Cnty.*, 730 S.E.2d 439, 443 (Ga. Ct. App. 2012).

Mr. Edwards argues that § 42-5-2 applies to this action, but in his brief, he does not address the district court's two reasons for denying his Rule 60(b) motion. First, the court ruled that a claim for medical expenses under § 42-5-2 must be pled to give "the defendant fair notice," and Mr. Edwards did not raise the statute until the summary judgment stage. *See* D.E. 219 at 13–14 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Second, and alternatively, the court ruled that Mr. Edwards had "not carried his burden to show that sovereign immunity has been waived." *Id.* at 14.

An "argument that has not been briefed before the court is deemed abandoned and its merits will not be addressed." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004). Mr. Edwards addresses neither his delay in failing to raise the statute until the summary judgment stage nor the sovereign immunity issue. We see no reason to resurrect this matter under *Access Now* because Mr. Edwards has abandoned any argument that the

reasons the district court provided for denying Rule 60(b) relief were in error. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014) (where an initial brief "fails to clearly raise any challenge to the alternative holdings," and "treats those holdings as though they do not exist," the argument that the holdings were error is abandoned, and affirmance is in order).

## VI

Finally, we consider the denial of Mr. Edwards' motion for attorney's fees under 42 U.S.C. § 1988(b) as premature. "Our review of the district court's denial of [§] 1988 attorney's fees is limited to determining whether there was an abuse of discretion." *Solomon v. City of Gainesville*, 796 F.2d 1464, 1466 (11th Cir. 1986) (citing *Ellwest Stereo Theatre, Inc. v. Jackson*, 653 F.2d 954, 955 (5th Cir. Unit B 1981)).

The district court deferred its ruling on the attorney's fees "until the appeal has been completed." D.E. 219 at 6. "If an appeal on the merits of the case is taken, the court may rule on the claim for fees, may defer ruling on the motion, or may deny the motion without prejudice." Fed. R. Civ. P. 54, Adv. Comm. Notes, 1993 Amendment. Nothing in Rule 54 or § 1988 requires the district court to order fees to the prevailing party before an appeal on the merits is resolved. We therefore conclude that the court did not abuse its discretion in deferring its calculation of reasonable fees and denying Mr. Edwards' motion without prejudice.

## VII

We affirm the judgment against Officer Grubbs, as modified by the reduction of the punitive damages award to $1 million. We also affirm the district court's Rule 50(b) judgment in favor of the City of Atlanta. We further conclude that the court did not abuse its discretion in deferring its ruling on the matter of attorney's fees. We do not reach whether the district court abused its discretion in denying the Rule 60(b) motion because Mr. Edwards has abandoned any challenge to the court's reasons.

**AFFIRMED.**

24-12787                NEWSOM, J., Dissenting                    1

NEWSOM, Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent from the portion of the Court's decision that denies Officer Grubbs qualified immunity on the claim that he violated Mr. Blasingame's Fourth Amendment rights. The Court's rejection of Officer Grubbs' qualified-immunity defense rests on two necessary premises: (1) that he used unconstitutionally excessive force when he tased Mr. Blasingame; and (2) that in doing so he violated "clearly established" law. The Court may or may not be right about the former—it's a close call, as the Court's own analysis reflects—but it is, in my view, wrong about the latter.

With respect to the "clearly established"-ness of the governing law, it's important to focus on exactly what the Court does—and doesn't—say. The Court notably does *not* say that the six (nine?) factors that inform its excessive-force analysis, *see* Maj. Op. at 16–19, so definitively favor Mr. Blasingame that any reasonable policeman in Officer Grubbs' position would have known that his conduct violated the Fourth Amendment. And with good reason. As an initial matter, it's pretty unrealistic to think that a law enforcement officer responding in the heat of the moment should be charged with working his way through a multi-part balancing test before deciding whether to deploy his taser. Moreover, and in any event, as the Court's own merits assessment demonstrates, the excessive-force factors here don't point uniformly (and certainly not decisively) in a single direction. For instance, the Court essentially acknowledges that Mr. Blasingame was "trying to flee" law enforcement when Officer Grubbs tased him. *See Wade v. Daniels*, 36 F.4th

1318, 1325 (11th Cir. 2022); Maj. Op. at 18.  So too, the Court concedes that there was a "need for the use of force," *Wade*, 36 F.4th at 1325, as Mr. Blasingame "showed no signs of ending the chase," and rejoins only that this factor doesn't "weigh heavily" in Officer Grubbs' favor, Maj. Op. at 18.  And while some of the excessive-force factors clearly support Mr. Blasingame—perhaps most notably, that he "did not commit (and was not suspected of committing) a serious or dangerous crime," *id.* at 16—others do so only marginally.  For example, with respect to the "relationship between the need for force and the amount of force used," the Court can bring itself to say only that it "tilts" in Mr. Blasingame's direction.  *Id.* at 18.

The point is clear enough, and the Court seems to get it: Having "consider[ed] and weigh[ed]" the manifold excessive-force factors in evaluating the merits of Mr. Blasingame's Fourth Amendment claim, the most that can be said is that "a reasonable jury could find" that Officer Grubbs violated the Constitution, *see id.* at 19—*not* that any reasonable officer would necessarily have come to the same conclusion.

How, then, if not by crunching the factors, does the Court get over the "clearly established" hump?  By analogizing this case to *Bradley v. Benton*, in which we held that an officer's conduct was "obviously unconstitutional even absent a case directly on point." 10 F.4th 1232, 1244 (11th Cir. 2021).  Respectfully, I just don't think the analogy holds up.

24-12787                    NEWSOM, J., Dissenting                    3

It's true, as the Court says, that *Bradley*, like this case, involved the "tasing [of] a non-dangerous and unarmed fleeing suspect." Maj. Op. at 20. But in a crucial respect, the cases are very different: The suspect in *Bradley* wasn't on a slope when he was tased, he was perched atop an 8-foot ledge. *See* 10 F.4th at 1240. Accordingly, we emphasized there, he was in a particularly "precarious position," with nothing but air between him and the concrete below. *Id.* Any jolt, we explained, would lead him to "los[e] his balance" and "fall from atop the wall." *Id.* at 1241. And that is presumably why the pertinent department policy in that case instructed that a taser should never be used when "the risk of falling" *itself* "would likely result in death"—as, for example, when the suspect was "on a roof or next to a swimming pool." *Id.*

Whether framed in terms of physics, trigonometry, or plain old common sense, the circumstances here are just different. Taking a look at the photos referenced in the Court's opinion, we see a grassy hill overgrown with vegetation. *See* Maj. Op. at 5–6 (citing D.E. 211-31 at 4, 9). The angle of descent is 30–40°, not the 90° at issue in *Bradley*. Accordingly, to be clear, this case did *not* involve a 24-foot "drop," as that term is ordinarily understood. *Contra* Maj. Op. at 21. Rather, it involved, at most—and I'm not trying to trivialize matters, just to distinguish *Bradley*—a very short drop, from a standing to a prone position, followed by a 24-foot downhill *tumble*. One needn't be a scientist—parsing the interactions between gravity, inertia, friction, etc.—to appreciate the difference between knocking someone off a high wall and causing him to roll down a hill.

In the end, I worry that the Court's conclusion is based not so much on an analogy to *Bradley*—perhaps because it recognizes the salience of the distinctions between the two cases—but on raw assertion: "[W]e need not find that the facts of *Bradley* are identical to the ones here," the Court says, "because we conclude, as did *Bradley*, that the obvious clarity principle carries the day." Maj. Op. at 21. A fair translation, I think, goes something like this: Officer Grubbs' conduct clearly violated the Fourth Amendment because, well, we say it did. Now, to be sure, the Court can't be blamed for engaging in *ipse dixit*. The "obvious clarity" path to clearly established law—QI's proverbial "Bucket Three"—essentially requires judges to make impressionistic determinations about the egregiousness of a defendant's conduct. But as I see it, Officer Grubbs' actions here don't even belong in the same conversation with those at issue, for instance, in *Hope v. Pelzer*, 536 U.S. 730 (2002) (lashing a shirtless and manacled inmate to a "hitching post" in the hot sun for seven hours), *Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002) (slamming an already-handcuffed and non-resistant woman's head into the trunk of her car in the course of arresting her for honking her horn), and *Piazza v. Jefferson County*, 923 F.3d 947 (11th Cir. 2019) (tasing a pretrial detainee for a second time even though he had collapsed, lay motionless for eight full seconds, and wet himself following an initial taser shot).

To this point, courts have been vigilant about reserving the obvious-clarity category for the worst-of-the-worst official misbehavior—the sorts of things, to be blunt, that any old fool would know violate the Constitution. Officer Grubbs' conduct here—

however debatable, and however undeniably tragic the consequences—just doesn't qualify.

Rather, it seems to me, this is a classic gray-area case—the very sort in which qualified immunity has (for good or ill) historically protected officers' split-second judgments. The situation that Officer Grubbs encountered was "tense, uncertain, and rapidly evolving." *Barnes v. Felix*, 605 U.S. 73, 90 (2025) (Kavanaugh, J., concurring). When Mr. Blasingame saw Officer Grubbs approaching, he fled along the shoulder of a highway, ignored orders to stop, hopped over a metal guardrail, and entered an overgrown area that, after a short upward slope, descended at what we now know was a 30° to 40° pitch toward another road. Faced with those circumstances—perhaps most notably, the fact Mr. Blasingame was running in the direction of a busy highway—Officer Grubbs decided to deploy his taser. Was he right to do so? Maybe not. But the "maybe" there does all the necessary work. The point is that Officer Grubbs wasn't obviously, indisputably *wrong* to use the taser. And that is conclusive.